MOLYCORP, INC., Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

**Lead Industries Association, Inc., et al., Intervenors.**

No. 98–1400.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 29, 1999.

Decided Dec. 17, 1999.

James L. Meeder argued the cause for petitioner. With him on the briefs was Robert D. Wyatt.

Daniel R. Dertke, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was Lois J. Schiffer, Assistant Attorney General. Steven Silverman, Attorney, U.S. Environmental Protection Agency, entered an appearance.

Before: SILBERMAN, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Molycorp, Inc., petitions for review of a Technical Background Document issued by the Environmental Protection Agency under the Resource Conservation and Recovery Act. Because the document is not a regulation that we may review, we dismiss the petition for lack of jurisdiction.

## I.

Molycorp, Inc., operates a mine in Mountain Pass, California, about 50 miles southwest of Las Vegas in the high desert of eastern San Bernardino County. The mine is the only major domestic source of rare earth metals: scandium, yttrium, and the lanthanides (elements with atomic numbers 57 through 71, running from lanthanum to lutetium on the periodic table). These elements are used as catalysts and also have applications in such fields as lighting, metallurgy, ceramics, magnets, and electronics. The mining process involves excavation from an open pit, followed by crushing, grinding, and flotation to concentrate bastnasite, a fluorocarbonate ore of rare earth metals. The concentrated ore is roasted and then leached with hydrochloric acid, producing cerium solids (which can be sold after thickening, filtering, and drying) and lanthanide chlorides (which are subjected to solvent extraction to separate individual lanthanide elements), as well as various waste products.

This case concerns the application of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq., to Molycorp's operations. RCRA establishes a comprehensive scheme for the regulation of the handling and disposal of solid wastes; under Subtitle C, it imposes especially stringent restrictions on hazardous wastes. But Subtitle C does not apply to all hazardous wastes. In 1980, Congress adopted the Bevill Amendment, which prohibited the EPA from regulating "solid waste from the extraction, beneficiation, and processing of ores and minerals," until it completed a study of the health and environmental effects of those wastes. 42 U.S.C. § 6921(b)(3)(A)(ii). After much delay—and some litigation, see generally Solite Corp. v. EPA, 952 F.2d 473 (D.C.Cir. 1991)—the EPA issued a regulatory determination concluding that wastes uniquely associated with mineral extraction and beneficiation (but not processing) were produced in large volumes and tended to present a lower risk of human exposure than industrial waste, so they would not be subject to Subtitle C regulation. 51 Fed. Reg. 24,496 (1986). The determination did not identify specific waste streams that were exempt, nor did it discuss the difference between beneficiation and processing. In 1989, the EPA addressed the Bevill status of processing wastes and determined by rule that a specific mineral processing waste would be exempt only if it met "high volume" and "low hazard" criteria. 54 Fed.Reg. 36,592 (1989). The rule also defined "beneficiation" in terms of a list of activities including "crushing, grinding, washing, dissolution, crystallization, filtration, sorting, sizing, drying ... and heap, dump, vat, tank and in situ leaching." 40 C.F.R. § 261.4(b)(7)(i).

This distinction between beneficiation and processing is significant, because all beneficiation wastes are excluded from Subtitle C regulation, while processing wastes are excluded only if they meet the high volume and low hazard criteria. To explain the definition, the EPA noted that beneficiation tends to produce "high volume solid waste streams that are essentially earthen in character. Despite the fact that valuable constituents have been removed, the remaining material is often physically and chemically similar to the material (ore or mineral) that entered the operation." 54 Fed.Reg. 36,619 (1989). Processing, on the other hand, generates "waste streams that generally bear little or no resemblance to the materials that entered the operation.... These operations most often destroy the physical structure of the material, producing waste streams that are not earthen in character." Id.

Under the EPA's definition, beneficiation is completed at a specific point in time; after that, all activities are processing. This means that a step that would otherwise be considered beneficiation will be considered processing if it is performed on material that has already undergone processing.

In 1998, the EPA issued a Technical Background Document, *Identification and Description of Mineral Processing Sectors and Waste Streams*. The 1038–page document addresses 49 different mineral commodities. It discusses each commodity, explains the steps used in its production, and describes the wastes generated by its extraction, beneficiation, and processing.

At issue is the section of the Technical Background Document discussing the rare earth industry. The draft version had described Molycorp's operations as producing some waste streams from beneficiation and others from processing. Molycorp submitted comments on the draft, objecting that the EPA's characterization of some of its operations as processing was inconsistent with the beneficiation/processing distinction set out in the 1989 rule. According to Molycorp, all of the operations at Mountain Pass are extraction or beneficiation, not processing. But the final document repeated the Agency's conclusion that for rare earths, "the beneficiation/processing line occurs between ore preparation and acid digestion when the ore is vigorously attacked with concentrated acids, resulting in the physical destruction of the ore structure," and that "all solid wastes arising from [any] operation(s) after the initial mineral processing operation are considered mineral processing wastes, rather than beneficiation wastes." It went on to identify specific waste streams resulting from rare earth processing operations. Molycorp petitioned for review, arguing that the document had been improperly issued without notice and comment, that its conclusions were inconsistent with the Bevill Amend-

ment, and that the 1989 rule was unlawfully vague insofar as it defined beneficiation.

## II.

■ We begin (and end) by considering whether we have jurisdiction to entertain Molycorp's challenge, and we conclude that we do not for three related but conceptually distinct reasons.

■ The judicial review provision of RCRA states that "a petition for review of action of the Administrator in promulgating any regulation, or requirement under this chapter or denying any petition for the promulgation, amendment or repeal of any regulation under this chapter may be filed only in the United States Court of Appeals for the District of Columbia." 42 U.S.C. § 6976(a)(1). As Molycorp recognizes, this statute is not merely a venue provision, requiring that challenges to final regulations be brought before us rather than in another court. It is also a limitation on our jurisdiction: we may review only final regulations, requirements, and denials of petitions to promulgate, amend or repeal a regulation. *See American Portland Cement Alliance v. EPA,* 101 F.3d 772, 775 (D.C.Cir.1996). Petitioner claims that the document is a regulation. To determine whether a regulatory action constitutes promulgation of a regulation, we look to three factors: (1) the Agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency. *See Florida Power & Light Co. v. EPA,* 145 F.3d 1414, 1418 (D.C.Cir. 1998). The first two criteria serve to illuminate the third, for the ultimate focus of the inquiry is whether the agency action partakes of the fundamental characteristic of a regulation, i.e., that it has the force of law.

The document (which was not published in the Federal Register) states that it "is intended solely to provide information to

the public and the regulated community regarding the wastes that are potentially subject to the requirements of this title." This disclaimer, which appears twice in the text, continues:

> While the guidance contained in this document may assist the industry, public and federal and state regulators in applying statutory and regulatory requirements of RCRA, the guidance is not a substitute for those legal requirements; nor is it a regulation itself. Thus, it does not impose legally-binding requirements on any party, including EPA, States or the regulated community.

The EPA has slightly obscured the non-binding nature of the document by stating, at the time the draft document was introduced and again before us, that it would have an "advisory" role in enforcement proceedings. *See* 61 Fed.Reg. 2,338, 2,354 (1996). We take this to mean only, as counsel assured us at oral argument, that the agency is advising the public as to its present enforcement inclinations—not that the document itself would be given any weight at all in enforcement proceedings.

Drawing on our cases construing the exceptions to the APA's notice and comment requirement, Molycorp contends that the Technical Background Document nevertheless must be deemed a regulation because it has effected a change in EPA policy. Assuming *arguendo* there was such a change, this argument is based on a misunderstanding of our cases. We have said that an interpretative rule construing a legislative rule cannot be modified without the notice and comment procedure that would be required to change the underlying regulation—otherwise, an agency could easily evade notice and comment requirements by amending a rule under the guise of reinterpreting it. *See Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C.Cir.1997). But the docu-

ment is not an interpretative rule. As we explained in *Syncor Int'l Corp. v. Shalala,*

> [I]nterpretative rules and policy statements are quite different agency instruments. An agency policy statement does not seek to impose or elaborate or interpret a legal norm. It merely represents an agency position with respect to how it will treat—typically enforce—the governing legal norm. By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach.... The primary distinction between a substantive rule—really any rule—and a general statement of policy, then, turns on whether an agency intends to bind itself to a particular legal position.

127 F.3d 90, 94 (D.C.Cir.1997). The document does not set out an interpretation of RCRA or of the EPA's regulations; it does not impose obligations on regulated interests or on the EPA. It is as the government insists merely a non-binding statement of the EPA's view of how it plans to regard particular activities relating to the production of mineral commodities. Therefore it is irrelevant whether the EPA has taken the same position in the past.[1]

A careful examination of petitioner's argument and the record, moreover, reveals another jurisdictional barrier. If Molycorp were correct in contending that EPA unlawfully changed its 1989 regulation, it first did so back in 1991. The Agency at that time wrote a letter to the California Department of Health Services saying that "the second 'leaching' step in [Molycorp's] operation appears to more closely resemble acid digestion (a mineral processing operation) than it does a conventional leaching (beneficiation) process," and identifying "lead filter cake," "iron filter cake," and "waste zinc contaminated with mercury" as mineral processing wastes generated at Mountain Pass. Then in 1992 the

---

**1.** To be sure, as we noted in *Syncor, see* 127 F.3d at 96, if an agency took a position in an enforcement proceeding in district court that was clearly inconsistent with a prior enforce- ment policy statement we would not be surprised if a district court's reaction was unfavorable.

EPA expressed substantially similar views directly to Molycorp's parent company. Under Molycorp's theory, those letters would have been "regulations" subject to judicial review. Yet the statute requires that review be sought within ninety days of the promulgation of the regulation. *See* 42 U.S.C. § 6976(a). Molycorp's petition would therefore be untimely.

If these problems were not enough, Molycorp's petition suffers from a third jurisdictional shortcoming: the issue it presents is not ripe. The record is less than pellucid in identifying the specific waste streams actually produced at Mountain Pass, and oral argument revealed that the parties disagree about what wastes are produced there. That uncertainty leaves open the possibility that there ultimately will be no disagreement over the proper regulatory classification of Molycorp's wastes. Thus, there does not currently exist a concrete controversy that is ripe for judicial review. *See Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 736, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). Nor can it be suggested that denying review now causes hardship to Molycorp, *cf. Abbott Labs. v. Gardner,* 387 U.S. 136, 152–53, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), because any enforcement proceeding against it would be based not on the document (which has no legal effect) but on the underlying 1989 regulation. Molycorp is no worse off than it would be had the document not been issued at all.

\*　　\*　　\*

It is difficult for us to understand why this case was brought before us at this time. The petition for review is dismissed.

*So ordered.*