Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued February 19, 2004      Decided April 2, 2004

No. 02-1242

GENERAL MOTORS CORPORATION,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY AND
MICHAEL O. LEAVITT, ADMINISTRATOR,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

---

On Petition for Review of an Order of the
Environmental Protection Agency

---

*John N. Hanson* argued the cause for petitioner. With him on the briefs were *Donald J. Patterson, Jr.* and *Justin A. Savage*.

*Michael A. Cox*, Attorney General, Attorney General's Office of the State of Michigan, *Thomas L. Casey*, Solicitor General, *Robert P. Reichel* and *Thaddeus E. Morgan*, Assis-

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

tant Attorneys General, were on the brief for *amicus curiae* State of Michigan in support of petitioner.

*Robert J. Martineau, Jr.* and *Edward M. Callaway* were on the brief for *amici curiae* Alliance of Automobile Manufacturers, *et al.* in support of petitioner. *Alison A. Keane* and *Julie C. Becker* entered appearances.

*Jon M. Lipshultz*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *John C. Cruden*, Deputy Assistant Attorney General, and *Mary E. Gleaves*, Counsel, U.S. Environmental Protection Agency.

Before: SENTELLE, ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The General Motors Corporation ("GM") petitions for review of May 7, 2002 letters from an enforcement official at the Environmental Protection Agency ("EPA") regarding nascent enforcement actions based on a regulatory interpretation that automobile manufacturing paint purge solvents are "solid waste" under the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*, upon exiting the spray painting unit. We dismiss GM's petition for lack of jurisdiction.

## I.

### A.

Subtitle C of RCRA, *see* 42 U.S.C. §§ 6921–6939e, "establishes a 'cradle to grave' federal regulatory system for the treatment, storage, and disposal of hazardous wastes." *American Portland Cement Alliance v. EPA*, 101 F.3d 772, 774 (D.C. Cir. 1996). The statute defines a "hazardous waste" as "solid waste … [that] may pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5). "Solid waste" is defined as "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from

industrial, commercial, mining, and agricultural operations." *Id.* § 6903(27). EPA regulations subject such waste to stringent standards, including, as relevant here, 40 C.F.R. Part 265 Subpart J, *id.* §§ 265.190–265.202, on tank systems, and Subparts BB and CC, *id.* §§ 265.1050–265.1064, 265.1080–265.1090, on air emissions from equipment and tanks that handle hazardous waste. Hazardous waste may also be subject to standards under state regulations, *see* 42 U.S.C. § 6926, and while an authorized state may enforce its hazardous waste program in lieu of the federal program, *id.* § 6926(d), EPA has dual enforcement authority under RCRA, *id.* § 6928, and may engage in pre-enforcement action or file a complaint without its state counterpart, so long as it notifies the authorized state. *Id.* § 6928(a)(2).

Under RCRA, EPA has broad investigatory and enforcement authority. EPA may require hazardous waste facilities to disclose particular information, *id.* § 6927, or to monitor and test for hazardous waste, *id.* § 6934, and EPA may inspect such facilities. *Id.* § 6927. Upon discovery of RCRA violations, EPA engages in pre-enforcement action by issuing an inspection report or a notice of violation to the facility. *See id.* §§ 6927, 6928. The facility may be afforded an opportunity to show cause why EPA should not proceed with an enforcement action. Absent such opportunity, or if EPA is unconvinced by the facility's showing, EPA can commence an enforcement action by filing an administrative complaint alleging violations of Subtitle C requirements and proposing a compliance order, suspension or revocation of the facility's permit, and a penalty. *See id.* § 6928(a); 40 C.F.R. Parts 22, 24. The owner or operator of the cited facility is entitled to a hearing before an administrative law judge, and upon an adverse decision, may appeal to the Environmental Appeals Board ("Board"). *See* 42 U.S.C. § 6928(b); 40 C.F.R. § 22.4. The Board's decision, as the final EPA decision, is judicially reviewable. *See* 42 U.S.C. § 6928(b); 40 C.F.R. §§ 22.27(d), 22.31. Alternatively, EPA can file a complaint directly in the federal district court for injunctive or other appropriate relief, *see* 42 U.S.C. § 6928(a),(h); 40 C.F.R. Parts 22, 24, including,

in certain instances, fines and imprisonment. *See* 42 U.S.C. § 6928(d).

**B.**

The underlying dispute between EPA and GM and the *amici* concerns the point of generation of RCRA "solid waste" in the automobile manufacturing industry's paint purge solvent processes. Shortly after the effective date of the Subparts BB and CC requirements, by letter of July 29, 1997, Elizabeth Cotsworth, the Acting Director of the EPA Office of Solid Waste,[1] responded to a letter from an attorney representing an unnamed client that uses solvents to clean automated spray painting guns when changing paint color.[2] The Cotsworth letter stated that, based on the system described, "the used solvent is waste once its leaves the spray painting unit, and [thus] . . . the equalization tank and associated piping are subject to hazardous waste regulatory requirements." After stating this "general interpretation of the federal regulations," the Cotsworth letter also advised that the "authorized state agency is responsible for interpreting its own regulations and making site specific regulatory determinations." In July 1998, EPA issued a copy of the Cotsworth letter as a supplement to the RCRA Permit Policy Compendium, which became available online to the regulated public in September 1998 on the RCRA website (hereinafter "RCRA Policy Compendium").

Beginning in 1998, EPA issued notices of violations, based on inspection reports, to several automobile manufacturing facilities, including GM plants in Doraville, Georgia and Kansas City, Kansas, as well as the Ford Motor Company's ("Ford") Avon Lake, Ohio plant, for failure to assure that the solvent piping systems used to convey purge solvents to

---

[1] Letter from Elizabeth Cotsworth, Acting Director, Office of Solid Waste, EPA, to Jill A. Weller, Thompson, Hine & Flory, P.L.L. (July 29, 1997).

[2] Letter from Jill A. Weller, Thompson, Hine & Flory, P.L.L., to Timothy Fields, Jr., Acting Assistant Administrator, Office of Solid Waste, EPA (June 16, 1997).

solvent recovery tanks met the requirements under RCRA Subtitle C. In September 1999, EPA filed an administrative complaint against Ford for failure to comply with the requirements under Subparts J, BB, and CC of the regulations, alleging that "[h]azardous waste is generated at the Facility when paint lines and equipment are cleaned with solvents." The following year EPA issued a notice of violation to the Toyota Motor Manufacturing plant in Princeton, Indiana. Similar notices of RCRA violations were issued by EPA in July 2001 to the BMW Manufacturing Corporation ("BMW") plant in Spartanburg County, South Carolina, and in February and November 2001 to GM's plants in Linden, New Jersey and Bowling Green, Kentucky. EPA invited GM's Bowling Green plant "to show cause why EPA should not take formal enforcement action against GM pursuant to" § 3008(a) of RCRA, 42 U.S.C. § 6928(a).

By letter of March 10, 2000, the Alliance of Automobile Manufacturers ("AAM"), which had been in discussions with EPA officials about EPA's enforcement initiative, expressed "concern[ ] about recent interpretations applying BB and/or CC requirements to [the automobile industry's] paint and purge processes."[3] AAM claimed that the interpretation in the Cotsworth letter was based on an incomplete picture of such processes. Urging a categorical position that the automotive manufacturing "painting system is a process that includes the use of purge solvent throughout the process," AAM argued that the point of generation of "solid waste" does not occur until the solvent is discarded when it exits that process upon reaching the solvent recovery tank. Further, by letter of July 3, 2001, AAM claimed that "EPA's recent enforcement actions represent an entirely new interpretation of the RCRA requirements," and that "[s]uch changes in regulatory interpretation and policy should be addressed on their merits before enforcement actions are undertaken."[4]

---

[3] Letter from Julie C. Becker, Assistant General Counsel, AAM (hereinafter "AAM Becker"), to David Eberly, Office of Solid Waste Permits & State Programs Branch, EPA (Mar. 10, 2000).

[4] Letter from AAM Becker, to Matthew Hale, Jr., Deputy Director, Office of Solid Waste, EPA (July 3, 2001).

AAM therefore requested that "EPA place a 'hold' on RCRA enforcement proceedings relating to automotive solvent recovery systems." Letters from the governors of several states and their environmental officials also expressed concern about the Cotsworth interpretation and its application at specific plants.

In response to AAM's letters and inquires from two automobile manufacturers, Eric V. Schaeffer, the Director of Regulatory Enforcement,[5] wrote on August 31, 2001, that the applicability of Subparts J and BB to piping systems conveying solvents from spray painting units "is quite clear." The Schaeffer letter advised that EPA "has consistently articulated [this] viewpoint," referencing the RCRA Policy Compendium. Indicating that EPA was willing, if there was data to support AAM's categorical position, to "consider revising the rule in light of [industry's] viewpoint that the requirements offer no environmental benefit," the Schaeffer letter advised that members of the industry still must "resolve liability for past violations," and urged resolution of compliance issues on a multi-facility basis.

AAM responded by letter of September 7, 2001, that it welcomed a meeting to focus on "needed environmental policy changes," and that it would provide information to "demonstrate that EPA's current regulatory interpretation — and the corresponding enforcement initiative — do not stand to produce environmental benefits."[6] AAM cautioned, however, that "[i]n this case, . . . a regulatory change may not be the most cost-effective or innovative approach." Seven months later, by letter of April 23, 2002, AAM wrote to three EPA Administrators, including Steven Shimberg, the Associate Assistant Administrator of the EPA Office of Enforcement

---

[5] Letter from Eric V. Schaeffer, Director of Office of Regulatory Enforcement, EPA, to Gary Weinrich, Manager, BMW Manufacturing Corp., W. Charles Moeser, Sr. Manager, DaimlerChrysler Corp., and AAM Becker (Aug. 31, 2001) (hereinafter "Schaeffer letter").

[6] Letter from AAM Becker, to Eric V. Schaeffer, Director of Office of Regulatory Enforcement, EPA (Sept. 7, 2001).

and Compliance, in order to "bring[ ] to a conclusion our continuing efforts to resolve the issue of purge solvent regulation in the automobile industry," and to present EPA with "a comprehensive resolution" in response to EPA's proposal of a consent agreement without regulatory change that included fines to recoup the economic benefit of noncompliance.[7]

On May 7, 2002, Steven Shimberg of the Office of Enforcement and Compliance wrote to AAM and several of its members, including GM (hereinafter "the Shimberg letters"). The Shimberg letter to GM stated in relevant part:

> The EPA continues to stand by its' 1997 determination on the point of generation for hazardous waste at spray paint operations and, as such, ancillary equipment transporting the hazardous waste purge solvent from the painting operations and the storage tanks to which the mixture is conveyed are subject to RCRA.... The Agency has spent considerable time and resources listening to and reviewing information presented by members of the automobile industry before reaching its position on the issues. In the hope that there is still a possibility to negotiate a settlement with individual members of the industry, I would like to reaffirm the settlement offer and acknowledge a change in one of the terms that is designed to address the industry's concern with the compliance deadline for ... Subpart BB.... For any member of the industry that does not wish to discuss the settlement offer, EPA will proceed with conventional inspections and enforcement.[8]

---

[7] Letter from Gregory Dana, Vice President of Environmental Affairs, AAM and AAM Becker, to Marianne Lamont Horinko, Assistant Administrator, Office of Solid Waste and Emergency Response, EPA, Steven Shimberg, Associate Assistant Administrator, Office of Enforcement and Compliance, EPA, and Thomas J. Gibson, Associate Administrator, Office of Policy, Economics, and Innovation, EPA (Apr. 23, 2002).

[8] Letter from Steven Shimberg, to Patrick J. McCarroll, Legal Staff, General Motors Corp. (May 7, 2002).

The Shimberg letter to AAM similarly stated that EPA disagreed with AAM's categorical critique of its enforcement initiative, that "EPA continues to stand by its' 1997 determination on the point of generation for hazardous waste at spray paint operations," and that the enforcement matters should proceed and be resolved through settlements or adjudications involving individual manufacturers.[9]

The EPA Office of Enforcement and Compliance Assurance sent an email on May 9, 2002 to Regions I–X that included a copy of the Shimberg letters. Following federal and state inspections, EPA issued, on May 31 and August 2, 2002, inspection reports to GM and notified GM of RCRA violations relating to the purge solvent piping systems at its plants in Spring Hill, Tennessee and Doraville, Georgia. EPA directed the Spring Hill facility to correct the violations and advised the Georgia Department of Natural Resources that EPA had classified the Doraville plant as a "significant non-Complier."

GM filed a petition in this court on August 2, 2002 for review of EPA's "final agency action ... regarding the RCRA classification of purge solvents in the automobile manufacturing industry, as expressed in a May 7, 2002 letter from EPA to the [AAM] ... and separately in a similar letter sent on May 7, 2002 to GM." GM, joined by *amici*, contend in their briefs that EPA's attempt in the Shimberg letters to regulate purge solvent piping systems unlawfully expands EPA's RCRA jurisdiction based on a novel characterization of purge solvents that ignores their performance of solvent functions after cleaning the spray painting unit. EPA filed a motion on October 21, 2002, to dismiss GM's petition for lack of jurisdiction. While rejecting the attack on the applicability of Subtitle C to purge solvent piping systems, EPA repeats in its brief that, as a threshold matter, the court lacks jurisdiction because the Shimberg letters are not regulations reviewable under RCRA § 7006(a), 42 U.S.C. § 6976(a), GM lacks standing, and GM's petition is untimely or unripe. As a court

---

[9] Letter from Steven Shimberg, to Gregory Dana, Vice President of Environmental Affairs, AAM, and AAM Becker (May 7, 2002).

of limited jurisdiction, we begin, and end, with an examination of our jurisdiction. *See Utility Air Regulatory Group v. EPA*, 320 F.3d 272, 277 (D.C. Cir. 2003).

## II.

Section 7006(a)(1) of RCRA, 42 U.S.C. § 6976(a)(1), limits the jurisdiction of the court to review of "action of the Administrator in promulgating any regulation, or requirement under this chapter or denying any petition for the promulgation, amendment or repeal of any regulation under this chapter." Hence, the court has jurisdiction over "only final regulations, requirements, and denials of petitions to promulgate, amend or repeal a regulation." *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999); *see also American Portland Cement*, 101 F.3d at 775. Three criteria determine whether a regulatory action constitutes the promulgation of a regulation: "(1) the Agency's own characterization of the action; (2) whether the action was published in the Federal Register or Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *See Molycorp,* 197 F.3d at 545. "The first two criteria serve to illuminate the third, for the ultimate focus of the inquiry is whether the agency action partakes of the fundamental characteristic of a regulation, i.e., that it has the force of law." *Id.*; *see also Croplife America v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003); *General Electric Co. v. EPA*, 290 F.3d 377, 382–83 (D.C. Cir. 2002); *American Portland Cement*, 101 F.3d at 776.

In several recent opinions, the court has had occasion to address what type of EPA action is judicially reviewable, eschewing the notion that labels are definitive. Thus, in *General Electric*, 290 F.3d at 382–85, and *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020–23 (D.C. Cir. 2000), the court held that EPA "Guidance" documents imposing new requirements were reviewable as final agency action. Such documents both marked the consummation of the agency's decision making process and determined rights or obligations of involved parties. *See General Electric*, 290 F.3d at 382;

10

*Appalachian Power*, 208 F.3d at 1022. The court in *Appalachian Power* explained:

> If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding."

208 F.3d at 1021; *see also General Electric*, 290 F.3d at 382–83. Similarly, in *CropLife*, 329 F.3d at 881–83, the court held that an EPA directive released in a press release was judicially reviewable: the directive was a final agency determination because EPA's changed position had immediate effect and thus was binding on it and the petitioners, and the petitioners "[would] be afforded no additional opportunity to make the arguments to the agency that they [ ] present[ed] in th[eir] petition [for judicial review]." *Id.* at 882.

GM seeks to bring the Shimberg letters within the folds of *Appalachian Power* and *CropLife* on either of two theories of finality. First, GM contends, because the regulatory status of paint purge solvents was an unresolved question that industry had discussed with EPA for several years, the interpretation in the Shimberg letters was a crystallization of EPA's position. Second, GM contends, even if EPA had previously resolved the solvents' regulatory status, EPA reopened the issue and renewed its adherence to its earlier interpretation in the Shimberg letters. Under either theory, GM contends that the text of the Shimberg letters "is unequivocal that EPA's decision on the regulatory status of purge solvents is final and that EPA intends it to be binding." Petitioner's Br. at 30. The Shimberg letters are binding in the field GM claims, as evidenced both by the May 9, 2002 email to the Regions attaching the Shimberg letters, and by the Guidance issued to the Regions at the end of 2002 after GM filed its

petition for review.[10]  Additionally, as evidenced by the subsequent enforcement actions against GM plants, GM maintains "EPA is explicitly basing enforcement action on the [regulatory] interpretation formulated in the [Shimberg letters]." *Id.* at 31 (internal quotation marks omitted).  GM therefore contends that EPA, in order to regulate purge solvent piping systems, attempted to amend the RCRA regulations through the Shimberg letters without providing notice and comment as required by the Administrative Procedure Act, *see* 5 U.S.C. § 553, and thus its action is unlawful.

Contrary to GM's theory, the Shimberg letters cannot accurately be characterized as the culmination of EPA's position on the applicability of Subparts J, BB, and CC to purge solvent piping systems.  The Shimberg letters reflect neither a new interpretation nor a new policy.  *See General Electric*, 290 F.3d at 382–83.  EPA's general regulatory interpretation was stated as early as 1997 in the Cotsworth letter.  That interpretation was published to the regulated community by September 1998 in the RCRA Policy Compendium, *see Appalachian Power*, 208 F.3d at 1020, and was applied to GM plants in 1998 and again in 2001.  In response to industry inquiries, EPA repeated its regulatory interpretation without change in the Schaeffer letter of August 31, 2001, and again in the Shimberg letters of May 7, 2002.  Nothing in the record indicates that the paint purge solvent issue was "unresolved"; rather, EPA's position was settled long before the Shimberg letters.

Under GM's alternative theory, EPA reopened the paint purge solvent issue by making itself available in response to industry's requests to discuss nascent enforcement matters in light of industry data relevant to the point of generation of RCRA "solid waste," and thereby caused the 90–day period for judicial review to run anew.  42 U.S.C. § 6976(a)(1).

[10]  *See* "Guidance on RCRA Subpart J Secondary Containment Requirements at Automobile Spray Painting Operations" (Nov. 18, 2002), and "Supplemental Guidance on RCRA Subpart J Secondary Containment Requirements at Automobile Spray Painting Operations" (Dec. 12, 2002) (hereafter "2002 Guidance").

Again, GM mischaracterizes EPA's conduct. The rationale of the reopening doctrine is not to stifle informal communications between agencies and the regulated industry. *See Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 398 (D.C. Cir. 1989). Rather, the doctrine seeks to ensure that "when the agency in question by some new promulgation creates the opportunity for renewed comment and objection," *Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C. Cir. 1998), affected parties may seek judicial review, even when the agency decides not to amend the longstanding rule at issue. *See Montana v. Clark*, 749 F.2d 740, 744 (D.C. Cir. 1984), *cert. denied*, 474 U.S. 919 (1985); *see also Public Citizen v. NRC*, 901 F.2d 147, 150 (D.C. Cir. 1990). There was no such "new promulgation" when EPA responded to industry's letters and requests for meetings regarding EPA's nascent enforcement actions. A "promulgation" involves more formal agency action, such as in *Montana*, 749 F.2d at 743–44, and *Ohio*, 838 F.2d at 1328–29, where the agency published proposed rules for comment, and in *Public Citizen,* 901 F.2d at 151, where the agency published in the Federal Register notice of its intention to reevaluate a prior decision to refrain from rulemaking. The Schaeffer letter did not constitute a public announcement of EPA's intention to reconsider its interpretation; while inviting submission of data to support industry's categorical position in order for EPA to evaluate whether to reconsider its interpretation and reopen the issue for public comment, the letter stated that outstanding violations would have to be addressed on the basis of EPA's long-held interpretation. Nor did the Shimberg letters constitute EPA's resolution of a formal reconsideration. *See CropLife*, 329 F.3d at 884; *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 331–32 (D.C. Cir. 1993); *Ass'n of Am. R.R. v. ICC*, 846 F.2d 1465, 1473 (D.C. Cir. 1988). In noting that EPA "has spent considerable time and resources listening to and reviewing information presented by members of the automobile industry before reaching its position on the issues," the Shimberg letters addressed whether industry had provided the "consistent, reliable information" invited by the Schaeffer letter that would justify scuttling nascent enforcement actions. Presumably, had EPA determined that indus-

try data supported a categorical approach, EPA would have issued a formal announcement of its intention to reconsider its regulatory interpretation. That never happened. In the absence of a "new promulgation," there was no reopening as would start anew the 90–day period for judicial review.

Viewed in their enforcement context, then, the Shimberg letters are not reviewable as final agency action under RCRA § 7006(a). "No legal consequences flow from [the Shimberg letters] . . . , for there has been no order compelling [GM] to do anything." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). The Shimberg letters neither mark the consummation of EPA's decisionmaking process nor impose new substantive rights or obligations on field personnel, the States, or third parties. *See Appalachian Power*, 208 F.3d at 1022. Rather, the letters were part of the ongoing dialogue initiated by industry about EPA's nascent enforcement actions at certain automobile manufacturing plants that were based on the regulatory interpretation in the RCRA Policy Compendium. *Cf. Molycorp*, 197 F.3d at 546; *see also FTC v. Standard Oil Co.*, 449 U.S. 232, 241–43 (1980)*; Reliable Sprinkler*, 324 F.3d at 731–32; *AT&T v. EEOC*, 270 F.3d 973, 975–76 (D.C. Cir. 2001); *Florida Power & Light Co. v. EPA*, 145 F.3d 1414, 1419–20 (D.C. Cir. 1998). EPA was continuing in the Shimberg letters to make settlement offers to individual members of the industry and, absent that, to litigate its interpretation in enforcement actions. *See Standard Oil*, 449 U.S. at 241. The Shimberg letters simply gave notice that, based on industry's data, EPA was not willing to promulgate a proposal for revising its regulatory interpretation or to scuttle pending enforcement actions.

Because nothing in the record indicates that the Shimberg letters imposed new requirements on regulated parties or exclusively guided EPA's subsequent enforcement activities, GM misreads the Shimberg letters in maintaining that they set forth an unequivocal final and binding new interpretation or renewed interpretation. All of the documents cited by GM and *amici* to demonstrate the impact of the Shimberg letters show only that: (1) EPA enforcement personnel have found,

since the late 1990s, both before and after the Shimberg letters, that based on the regulatory interpretation in the RCRA Permit Policy Compendium, the statutory and regulatory requirements, and site-specific inspections, purge solvent piping systems are subject to RCRA Subtitle C at some automobile manufacturing facilities; and (2) some states appear to agree generally with GM and *amici* that automotive purge solvent piping systems categorically are not subject to RCRA Subtitle C regulation. By attaching the Shimberg letters to an email to the field on May 9, 2002, EPA did not impose new obligations in the field; rather, it did no more than state the obligations set forth in the RCRA Policy Compendium. *Cf. Appalachian Power*, 208 F.3d at 1022. Similarly, the 2002 Guidance relied on by GM neither imposed new requirements on the field nor mentioned the Shimberg letters; rather, it was based on § 265.193 of Subpart J and the regulatory interpretation set out in the RCRA Policy Compendium. *Cf. id.* at 1020–23; *General Electric*, 290 F.3d at 381–85. There is no basis, therefore, to conclude that EPA was attempting through the Shimberg letters to amend RCRA regulations, much less that the letters constitute final agency action under RCRA § 7006(a).

Moreover, to the extent that GM's petition challenges the regulatory interpretation in the Shimberg letters the challenge is untimely. That interpretation, which EPA relied on in issuing notices of violations to GM and other automobile manufacturers, was set forth in the RCRA Policy Compendium. Although the interpretation was not published in the Federal Register, *see Florida Power*, 145 F.3d at 1418; *American Portland Cement*, 101 F.3d at 776–77, "[w]ith the advent of the Internet, the agency does not need these official publications to ensure widespread circulation; it can inform those affected simply by posting its new guidance or memoranda or policy statement on its website." *Appalachian Power*, 208 F.3d at 1020. GM's petition was filed long after the 90–day period for judicial review expired following the posting of EPA's interpretation on the RCRA website. *See* 42 U.S.C. § 6976(a)(1). AAM's letters make clear that industry was aware of EPA's regulatory interpretation, and instead

of mounting a judicial challenge to that interpretation as final agency action, chose to meet with EPA officials in order to present data that industry thought would demonstrate that EPA's interpretation was based on an incomplete understanding of the role of solvents after they leave the spray painting guns and, therefore, was contrary to RCRA.

Furthermore, to the extent GM's petition challenges the application of EPA's regulatory interpretation to GM plants, the challenge is unripe. Under the two part test in *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–53 (1967), the balance weighs in favor of postponement of judicial review. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)*; State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479–80 (D.C. Cir. 1986), *cert. denied* 480 U.S. 951 (1987); *Eagle-Picher Indus., Inc. v EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985)*; cf. General Electric*, 290 F.3d at 380–81; *Molycorp*, 197 F.3d at 547. First, GM's challenge is not "fit" for judicial review. Although GM relies on the interpretation of RCRA "solid waste" in *Association of Battery Recyclers v. EPA*, 208 F.3d 1047, 1050–56 (D.C. Cir. 2000), GM's challenge to EPA's interpretation does not present a pure question of law. *See Abbott Labs.*, 387 U.S. at 149; *Florida Power*, 145 F.3d at 1421; *City of Houston v. HUD*, 24 F.3d 1421, 1431 (D.C. Cir. 1994). Whether paint purge solvent piping systems are subject to RCRA is partly a factual question dependent on the findings of inspections conducted at individual plants. The Shimberg letters contain no factual information about any particular automobile manufacturing plant. The 2002 Guidance cited by GM likewise emphasizes the need for site-specific determinations. That need was illustrated by EPA counsel during oral argument who explained that purge solvent piping systems at specific plants may not be subject to RCRA regulation if, for example, the purge solvents are recirculated and reused to clean the spray painting unit, or reused (without being reprocessed) directly in the manufacturing process, as distinct from the waste management process. *See* 40 C.F.R. § 261.2; *see also* Hazardous Waste Management System; Definition of Solid Waste, 50 Fed. Reg. 614, 624 (Jan. 4, 1985) (codified at 40 C.F.R. §§ 261.1(b),

261.2(e), and Part 266 Subpart F). EPA's expression of "disappoint[ment]" with South Carolina's decision to settle with BMW's Spartanburg County plant does not indicate, as GM maintains, that EPA has categorically rejected the "continuous recirculation" exception; EPA's concern arose because the wastes were not recirculated through the plant's paint guns but through the plant's waste handling system, and, in any event, the letter to which GM points states that EPA "has not decided what, if any, action it may take in this matter."[11]  Second, any hardship suffered by GM as a result of postponement of judicial review is ameliorated by its opportunity to challenge EPA's regulatory interpretation administratively, unlike the petitioners in *Appalachian Power* and *CropLife*. *See Florida Power*, 145 F.3d at 1421.  For instance, on October 17, 2003, EPA filed an administrative complaint against GM's plants in Moraine, Ohio and Pontiac and Lake Orion, Michigan, alleging violations of Subparts J, BB, and CC in their paint purge solvent processes. The arguments GM presents in its brief can be presented at an agency hearing and before the Board, *see* 42 U.S.C. § 6928(a)-(b);  40 C.F.R. Parts 22, 24, prior to judicial review. 42 U.S.C. § 6928(b);  40 C.F.R. §§ 22.27(d), 22.31.  This circumstance militates against review now. *See City of Houston*, 24 F.3d at 1432 n.10.  GM points to no "irremediable adverse consequences [that will] flow from requiring a later challenge." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967).  Counsel for EPA stated during oral argument that, upon such judicial review, EPA would not argue that GM's petition is untimely under RCRA § 7006(a)(1), 42 U.S.C. § 6976(a)(1), for failure to appeal EPA's purge solvent interpretation at an earlier date.

Under the circumstances, "[i]t is difficult to understand why this case was brought to the court at this time." *Molycrop*, 197 F.3d at 547.  The proper functioning of EPA

---

[11]  Letter from Phyllis P. Harris, Principal Deputy Assistant Administrator, Office of Enforcement and Compliance Assurance, EPA, to R. Lewis Shaw, Deputy Commissioner, Environmental Quality Control, South Carolina Department of Health & Environmental Control (Nov. 5, 2002).

includes candid discussions with RCRA regulated industries regarding investigations, negotiations, and settlements. The conduct of GM, AAM, and other members of the automobile manufacturing industry illustrates their awareness of the value of such discussions. Urging adoption of a categorical position, industry presented data to EPA about the role of paint purge solvents after they leave the spray painting guns. AAM's letter of September 7, 2001 candidly acknowledged that industry was seeking a "cost-effective or innovative approach" independent of regulatory change. Such discussions also avoid premature litigation in the courts. *See Standard Oil*, 449 U.S. at 242–43; *Reliable Sprinkler*, 324 F.3d at 732. Being too late to challenge EPA's interpretation in the RCRA Policy Compendium, and too early to challenge it through final EPA adjudicatory action of RCRA violations at specific GM plants, GM seizes on the Shimberg letters to overcome those jurisdictional hurdles. But the Shimberg letters were merely preliminary enforcement statements made as part of an informal agency-industry dialogue and, of themselves, finally determine no rights or obligations of involved parties. Accordingly, we dismiss the petition for lack of jurisdiction and do not reach the merits of GM's challenge to EPA's regulatory interpretation.